In the Matter of the Complaint of RIO GRANDE TRANSPORT, INC., as Owner of S.S. YELLOWSTONE, for Exoneration from or Limitation of Liability.

In the Matter of the Complaint of COMPAGNIE NATIONALE ALGERIENNE DE NAVIGATION, as Owner of the Motor Vessel IBN BATOUTA, for Exoneration from or Limitation of Liability.

Nos. 78 CIV 2702 (LBS) 78 CIV 5972 (LBS).

United States District Court, S.D. New York.

Nov. 5, 1986.

Burlingham, Underwood & Lord, New York City, for Rio Grand Transport, Inc.; Robert B. Pohl, of counsel.

Kirlin, Campbell & Keating, New York City, for Compagnie Nationale Algerienne De Navigation; Richard H. Brown, of counsel.

Tenzer, Greenblatt, Fallon & Kaplan, New York City, for Embassy of Tunisia and Office National de Cereales; William M. Pinzler, Marc J. Kurzman, of counsel.

## OPINION

SAND, District Judge.

This matter, which relates to an admiralty award of prejudgment interest, is before the Court on remand from the Court of Appeals which instructed that we "modify

the prejudgment interest awarded under each judgment after determining, in view of all the circumstances, including the expectations of the parties at the making of the respective settlement agreements, what constituted reasonable times for CNAN to pay." *Matter of Rio Grande Transport, Inc.,* 770 F.2d 262, 265 (1985).

The parties have agreed to submit this question to the Court on written submissions which were comprised of the deposition testimony of Tunisia's expert witness, M.E. DeOrchis, Esq., representatives of CNAN, Ali Larbi Cherif, and its underwriter ("CAAR") Tahar Bala; Affidavits of Jerome Lipper, Esq. (counsel for Tunisia) and Robert B. Pohl, Esq. (counsel for Rio Grande), together with the Joint Appendix to the Court of Appeals ("JA") and the Exhibits to the Deposition of Cherif and Bala.

At the outset, it should be noted that the parties are in disagreement as to whose state of mind is brought into question by the Court of Appeals' reference to the "expectations of the parties at the making of the respective settlement agreements." Tunisia interprets this language to refer to the intentions of the experienced and sophisticated New York admiralty lawyers who negotiated and reached a settlement of litigation pending in this Court. To this end it relies on the testimony of Mr. DeOrchis as to the understandings and practices of members of the local admiralty bar. This testimony is to the effect that a reasonable time between the arriving at a settlement and the payment of that settlement in admiralty disputes would be between four and eight weeks. T 8. Mr. DeOrchis further testified that in his opinion the larger the sum involved in an admiralty litigation, the more expeditious the handling, because larger claims are handled by senior people with more authority to make payment than lower level employees who handle smaller claims. It was Mr. DeOrchis' opinion that the fact that the shipowner was a foreign country should not alter these time estimates because one set of rules governs with respect to all who participate in shipping matters. Currency

restrictions, in his view, were not a significant factor because "the government-owned line obviously will be able to arrange for the export of funds a lot faster than the individual, private individual." T 11–13.

Counsel for CNAN, however, focuses on the problems of dealing with Algiers, described as a " 'third world' socialist country rather than a modern industrial state such as the United States" (Memorandum on Interest in behalf of CNAN, pp. 3–4) including the necessity to conduct business through an English solicitor, translate all documents from French to English or vice versa and the considerable "bureacracy" entailed in effecting payment of these settlements. Emphasizing the Court of Appeals' reference to "all of the circumstances," CNAN urges that the focus of the inquiry should not be on local admiralty practices but what could reasonably be expected of a party such as Algiers. (Both CNAN, the shipowner and CAAR, its underwriter, are agencies of the Algerian government).

But, the short answer must be that we look to the reasonable expectations of the parties acting through their authorized representatives before this Court. The inquiry is, "at the making of the respective agreements," what would the parties, acting through these representatives, have deemed to have been a reasonable time for making payment in the light of their knowledge of the nature and practices of their respective clients.

We set forth in Appendix A hereto a chronology of the events between March 1983 when an oral agreement of settlement was reached by counsel, and September 18, 1984 when payment was finally received. Although Appendix A is a single listing, it sets forth events occurring in New York, London and Algieria, some of which took place almost simultaneously and were not fully known to all of the participants. We agree with the observation of CNAN's counsel that "... we now have a far clearer picture of the situation than formerly."

Memorandum on Interest in Behalf of CNAN, p. 24.

Thus, while before this Court counsel for CNAN repeatedly cited currency exchange problems—a hardly persuasive ground for delay in a settlement with the foreign sovereign itself (JA 48)—it now appears that three major events caused the delay in payment:

1) The Ministry of Finance of Algieria's insistence on formal approval of CAAR;

2) The requirement of protocoles d'accord;

3) Use of the wrong account number and description in transmittal of funds.

We will examine each of these to determine whether the parties reasonably expected the delay which these events occasioned.

1. The Ministry of Finance on February 1, 1984 requested the reason why CNAN (the shipowner, a government entity) had submitted the request for payment rather than CAAR (the underwriter, another government entity).

We need not speculate as to whether or not this event and its consequent delays were anticipated even by CNAN's/CAAR's own representatives.

"This requirement by the Ministry of Finance was unexpected since CNAN had never been refused previously by the Ministry of Finance (Cherif 21) and, as outlined in the narrative above, the Ministry of Finance had long been aware that CNAN was processing the request. As matters turned out, although prior to the developments in this case, CNAN had made requests for payment in matters involving CAAR, *after* this case where CAAR was involved CAAR always had to make requests for payment (Cherif 20, 22, 25, 26)."

Memorandum on Interest in Behalf of CNAN, p. 7 (emphasis in original). *See also id.* at 30 "This action is, in our eyes, inexplicable ..."

It is clear therefore that the delay occasioned by this bureaucratic red tape between two governmental agencies was un-expected and "unreasonable," as we shall later define that term.

2. On July 10, 1984 CAAR advised CNAN Legal of the need for protocoles d'accord. As CAAR's director Tahar Bala testified:

"This was the first time that protocoles d'accord had been requested as indispensable by the ministry of finance, to my knowledge."

Balas, p. 7.

Clearly the delays occasioned by this newly imposed formality were unanticipated and "unreasonable." CNAN's counsel characterized the requirement of protocoles d'accord as being imposed "unprecedentedly and unexpectedly". Memo of CNAN, p. 30.

3. Misdirection of funds.

In transmitting funds to Chase on September 7, 1984, one numeral was omitted from the account number and the account name given was Mrs. Leon Weill Mahoney—a distortion of the firm name for Tunisia's counsel, Messrs. Leon, Weill and Mahoney.

The consequence of this error was that the funds were retransmitted to Algiers by Chase (despite daily checking by counsel for Tunisia with Chase) and were not actually received by Tunisia's counsel until September 19, 1984. Were we dealing solely with an inadvertent 12 day delay, the question would border on being de minimus but in evaluating this delay in the entire context of this case, it would appear that CNAN did not put Tunisia in funds to which it was entitled until 12 days later because of an unexpected error chargeable to Tunisia.

### *"Unreasonable" Delay and the Contentions of the Parties*

CNAN urges that because the delays occasioned by events (1) and (2) above were unprecedented, they were reasonable. First, we note the obvious conflict between CNAN's position that there were *no* unreasonable delays and the language of the Court of Appeals in remanding this case:

In view of the length of time between the settlements and their eventual payment, especially with respect to Tunisia, it appears that CNAN's payments did not arrive within a reasonable time. But injuries to Tunisia and Rio Grande caused by CNAN's delays began only after the delays became unreasonable.

*Matter of Rio Grande Transport, Inc.,* 770 F.2d at 264.

◼ Second, the concept of unreasonable delay requires some explication, especially to clients not versed in our legal system. Characterizing a *delay* as unreasonable does not mean that the party or event causing the delay necessarily acted in an unreasonable fashion. We do not understand Tunisia or Rio Grande to be urging that the Ministry of Finance did not have the right or power to impose new procedures or formalities. As the Court of Appeals noted, in admiralty an award of prejudgment interest is not a punitive measure but rather is to compensate the other party for loss of the use of the money after such time as it reasonably should have anticipated receiving the funds. Nor is the good faith of CNAN's counsel and witnesses at issue. As noted above, they appropriately made no effort to conceal their surprise at the imposition of new and delaying procedures.

◼ Tunisia requests an order imposing prejudgment interest for the period November 17, 1983 to September 18, 1984 (Tunisia's Memorandum, p. 4) on the grounds that it was Tunisia's expectations, in accordance with local admiralty procedures for payment to be made within four weeks of settlement. DeOrchis, p. 22–23. But "In view of all the circumstances" (770 F.2d at 263) now known to the Court and the parties, we would measure the starting point for unreasonable delay—*i.e.,* delay contrary to the expectations of the parties—to February 1, 1984, when the requirement for CAAR approval was first enunciated, occasioning another round of red tape.

We conclude as to Tunisia that any delay past February 1, 1984 was unreasonable

and that Tunisia is entitled to prejudgment interest from that date through September 18, 1984, and post judgment interest from September 26, 1984 to the present.

◼ As the chronology, Appendix A, indicates, the time table and expectations of Rio Grande differ from those of Tunisia. When CNAN approved the Rio Grande settlement, CNAN's counsel stated that "it will not be possible to make payment of the approved settlement until the middle to the end of May" (JA 38) so that there was a contemporaneous articulation of the expectations of CNAN's authorized representative. The delays from mid-May to September were occasioned *inter alia* by the requirement for the protocoles d'accord, a requirement not even asserted until July 1984.

Rio Grande seeks pre-judgment interest from May 7, 1984. We believe June 1, 1984 is the more appropriate date in the light of the contemporaneous representations that payment would be made by the end of May, and we award pre-judgment interest from that date.

Settle Order.

## APPENDIX A

### CHRONOLOGY

March, 1983 Oral settlement agreement among Tunisia, Rio Grande and CNAN. Rio Grande and CNAN each agree to pay Tunisia $900,000 for loss of cargo. CNAN agreed to pay Rio Grand $1,316,500 (JA 17). Rio Grande and CNAN request documentation (JA 23).

May 10, 1983 CAAR (CNAN's underwriter) approves settlement. (Ex 1, Cherif 8).

May 15, 1983 CNAN Legal Division requests payment of CNAN Financial Division. (Ex 2, Cherif 10).

July 18, 1983 CNAN requests Ministry of Finance to authorize transfer of $900,000. (Ex 4).

Aug. 3, 1983 CNAN Legal reminds CNAN Finance of its May 15, 1983 communication that the Ministry of Finance be advised of "the risk that our opponents will

lose patience and will renounce the agreement concluded on the basis of 50% of the claim (in accordance with the approval of CAAR). Such an eventuality would have a serious impact on our credit and could cause us serious damage." (Ex 2).

Sept. 7, 1983 Ministry of Finance requested CNAN "to pass to them in the French language a detailed report by our lawyers." (Ex 4).

Oct. 13, 1983 Tunisia furnishes documentation acceptable to counsel. Rio Grande pays Tunisia in October 1983 with funds paid or reimbursed by Rio Grande's P & I underwriter in London. (JA 23).

Oct. 17, 1983 Settlement approved by Court on representation that it has been agreed to by attorneys for Rio Grande, CNAN and Tunisia as being reasonable. (JA 10).

Oct. 22, 1983 Request of Ministry of Finance dated Sept. 7, 1983 transmitted to CNAN Legal. (Ex 5).

Oct. 27, 1983 Attorney for Tunisia advises settlement funds should be wired to account of Tunisia's New York attorneys at Chase Manhattan (JA 23–24).

Nov. 4, 1983 Counsel for CNAN replies that funds were not at hand; that London solicitors advised an "urgency" and responded that "there were exchange difficulties."

Nov. 29, 1983 Counsel for CNAN advises Court that "funds have been requested of our Algerian client but we are informed that exchange regulation problems in Algeria are delaying their transmission. We anticipate that instructions will be received with regard to outstanding matters within the next month...." (JA 34–35).

Dec. 4, 1983 CNAN issues request for payment for $900,000. (Ex 15).

Dec. 20, 1983 CNAN Financial requested Ministry of Finance to authorize transfer of $900,000.

Dec. 27, 1983;

Jan. 19, 1984 Tunisia counsel makes inquiry of Tunisia's London solicitor and advised "funds had not yet been received despite constant pressure." (JA 24).

Feb. 1, 1984 Ministry of Finance writes to CNAN asking why "the request for payment has been submitted in this case by CNAN instead of and in place of CAAR [CNAN's underwriter] who are normally supposed to effect such payments." (Ex 6).

Feb. 3, 1984 Rio Grande's attorneys advised they had authority to settle. (JA 48).

Feb. 7, 1984 CNAN receives letter of Feb. 1, 1984.

Feb. 19, 1984 CNAN writes to CAAR requesting CAAR to settle the sum in accordance with the instructions of the Ministry of France.

Feb. 20, 1984 CNAN's London solicitor advised that CNAN had applied for exchange control permission to remit $900,000 which was refused. (JA 24).

Feb. 28, 1984 CNAN's London solicitor responds to CAAR's telephone request on Feb. 20, 1984 summarizing the history of the litigation concluding "I hope therefore that you will accept my recommendation to conclude this matter on this basis and to put in hand arrangements for the remittance of the total sum of $1,739,750 in order that I can put an end to this long and tragic matter." (Ex 9).

March 6, 1984 Counsel for Tunisia advises counsel for CNAN that unless settlement proceeds were in hand by no later than April 1, 1984 Tunisia's attorneys were instructed to proceed before this Court to compel payment. (JA 24, 36).

March 13, 1984 CNAN's London solicitor telexes CAAR and CNAN advising of March 6th letter, thanking them for their March 10, 1984 approval of the settlement and instructing re transmittal of funds.

Mar. 23, 1984 Rio Grande's attorneys advised settlement approved. Further advised that "... it will not be possible to make payment of the approved settlements until the middle to the end of May ..." (JA 49).

Mar. 28, 1984 Counsel for CNAN writes to Court advising the English solicitors advised that "it has been extremely difficult to explain the concepts involved in this case, including cross-claims and limitation of liability, to the Algerian shipowner and Algerian underwriters who are the principals.

\* \* \* \* \* \*

They further advise that it will not be possible to make payment of the approved settlements until the middle to the end of May inasmuch as payment of substantial sums in convertible currency poses considerable administrative problems in a third world country such as Algeria where both shipowners and underwriters are state corporations." (JA 37–38).

Apr. 28, 1984 Counsel for Tunisia formally confirms and agrees to settlement in letter to CNAN and CAAR's solicitor. (JA 39).

May 4, 1984 Rio Grande's counsel similarly confirms settlement for $1,316,500, stating: "However, we reserve our rights to enter a judgment and to demand interest on this sum from the date of judgment because of the delay in making payment." (Ex 22).

May 27, 1984 CAAR prepares an Average Statement.

May 31, 1984 At request of counsel for CNAN/CAAR attorney for Tunisia sent two executed releases to be held in escrow and CNAN/CAAR's New York counsel telexed their solicitor inquiring about funds.

June 18, 1984 CNAN's New York counsel advised that "Algerian underwriters had again pressed the Ministry of Finance for exchange control consent." No funds received. (JA 25).

July 10, 1984 Ministry of Finance advises for the first time (Bala 7, Ex 30) that transfer of funds could not be effected without "protocoles d'accord", *i.e.* formal documents signed by the parties.

July 11, 1984 At a conference with the Court, counsel for Tunisia expressed their sense of frustration at not having received payment and counsel for CNAN told of the difficulties in client communication noted above. The Court stated that it would entertain motions for prejudgment interest or enter judgment immediately unless payment were received by the end of July. Counsel for CNAN telexed this information to CNAN's solicitor. (JA 26).

July 19, 1984 Tunisia signs protocoles d'accord providing for release of all claims provided that monies paid by July 31, 1984.

July 25, 1984 CAAR advised solicitor had received Tunisia's protocole and "have done the necessary. As for the claim of [Rio Grande] we still await the settlement agreement in order to transfer the money. Also, by reason of this delay, the time limit imposed (up to 31.7.84) cannot be complied with." (Ex 34).

July 31, 1984 Rio Grande signed a similar protocole d'accord forwarded by owner to CAAR on July 31, 1984. (JA 27). CNAN's solicitor telexes their New York counsel that the $900,000 for Tunisia was already on its way. (JA 27).

Aug 1–3, 1984 No funds received. Inquiries re name and number of telex and sender.

Aug. 7, 1984 CNAN's solicitor goes to Algieria and telexes New York counsel that:

"all necessary ministerial approvals have been received and remittances were then being processed by the Algerian Central Bank but, for bureaucratic reasons, the cargo payment had been held up until the Rio Grande agreement was received and therefore both payments would be effected together with the best estimate of the arrival of funds being August 14 at the latest." (JA 27–28).

Aug. 14, 1984 No funds received. Solicitor advised by CAAR that transfers had been effected by their bank on August 11. (JA 28).

Aug. 22, 1984 Algerian Bank advised CAAR that transfer would take effect on Aug. 25 or Aug. 26. (JA 29).

Aug. 29, 1984 CNAN's solicitor telexed New York counsel that funds had been transferred to Manufacturers Hanover Trust Company. (JA 29).

Sept. 7, 1984 Tunisia counsel advises counsel for CNAN that funds were traced through Manufacturers to Chase. One numeral had been omitted from account number which had otherwise been misdescribed and Chase returned the funds to the Algerian Bank. (JA 29). Chase had kept the funds for five days before returning them.

Sept. 18, 1984 Payment received. (JA 102).